CRAIG SANDERS,

     Plaintiff,

     v.

COUNTY OF CAMDEN, et al.,

     Defendants.

HONORABLE NOEL L. HILLMAN

CIVIL ACTION NO. 15-1129

**OPINION**

**APPEARANCES:**

HARTMAN DOHERTY ROSA BERMAN & BULBULIA, LLC
By: Tal Z. Cushmaro, Esq.
65 Route 4 East
River Edge, New Jersey 07661
     Counsel for Plaintiff

HOLTZMAN & McCLAIN, P.C.
By:  Stephen D. Holtzman, Esq.
    Jeffrey S. McClain, Esq.
524 Maple Avenue, Suite 200
Linwood, New Jersey 08221
     Counsel for Defendant CFG Health Systems, LLC

PARKER MCKAY, P.A.
By:  Elizabeth M. Garcia, Esq.
9000 Midlantic Drive, Suite 300
P.O. Box 5054
Mount Laurel, New Jersey 08054
     Counsel for Defendant Peter Farlow Sr.

THE VIGILANTE LAW FIRM, P.C.
By:  Jacqueline M. Vigilante, Esq.
99 North Main Street
Mullica Hill, New Jersey 08062
     Counsel for Defendant John Vernon

THE OFFICE OF CAMDEN COUNTY COUNSEL
By:  Anne E. Walters, Assistant County Counsel
520 Market Street, 14th Floor
Camden, New Jersey 08102

Counsel for Defendants County of Camden, Camden County
Correctional Facility, Correctional Officer Nnakuru R.
Chukudi, and Warden Eric M. Taylor

**HILLMAN**, United States District Judge:

Plaintiff, Craig Sanders, who was at all relevant times,
incarcerated in the Camden County Correctional Facility (CCCF),
brings this § 1983 suit alleging that, as a pretrial detainee in
the CCCF, he was beaten by three corrections officers, Defendants
Vernon, Farlow, and Chukudi.  Sanders further asserts that he was
denied adequate medical treatment from Defendant CFG Health
Systems for the injuries he asserts resulted from the alleged
beating, which allegedly resulted in a 10-day hospital stay and
three surgeries on Sanders' right leg.

Presently before the Court are Defendants' Motions for
Summary Judgment [Docket Nos. 71, 75, 78, 79].  For the reasons
stated herein, Defendant CFG's motion will be granted in its
entirety; the corrections officers' motions will be granted in
part, denied as moot in part, and denied in all other respects;
and the remaining Camden County Defendants' motion will be granted
in part and denied in part.

**I.**

Between midnight and 1 a.m. on January 27, 2013, Plaintiff
Sanders was involved in a physical altercation with Defendant
Corrections Officers Vernon, Farlow, and Chukudi. (Pl's Ex. 9,

Camden County Department of Corrections General Incident Report;
Vernon Dep. p. 69)

The incident occurred in Sanders' cell, which he shared with inmate William Cooper. (Pl's Ex. 9; Sanders Dep. p. 17, 24, 89, 91, 136-37; Cooper Dep. p. 45-46)  Both Sanders and Cooper were asleep when all three Defendants Vernon, Farlow, and Chukudi entered the cell. (Pl's Ex. 9, Sanders Dep. p. 15, 17; Cooper Dep. p. 45)[1]  It is undisputed that Vernon was yelling as he entered the cell.

Sanders and Cooper testified that Vernon was yelling profanities in a "vicious" or "degrading" manner. (Sanders Dep. p. 89; Cooper Dep. p. 45)  Vernon testified that he was "yelling" but he could "not specifically" recall what he said. (Vernon Dep. p. 74)  Defendant Farlow testified that Vernon was "definitely agitated." (Farlow Dep. p. 76)

Defendant Farlow further testified:

[Defendant Vernon] went right to the cell, he opened the door.  He walked in.  I believe Chukudi followed, I stood at the door, and he was yelling as he entered [Sanders'] cell.  And as he walked towards the center of the cell, Mr. Sanders [who was on the top bunk] turned over with his hands and feet flailing toward Lieutenant Vernon, at which point Lieutenant Vernon grabbed him and threw him to the floor. Chukudi assisted him.  They were in front of me.

---

[1]  When Defendant Vernon was asked at his deposition, "Did it look like Sanders had been sleeping at the time you walked in[to] [the cell]?" Vernon answered, "I couldn't tell." (Vernon Dep. p. 80)

(Farlow Dep. p. 75)[2]

Defendant Vernon testified:

A:  As I enter the cell, Inmate Sanders swings his feet off the [top] bunk and kicks me.

Q:  Did it look like Sanders had been sleeping at the time you walked in?

A:  I couldn't tell.

Q:  Was he lying down?

A:  When I saw him he was in a somewhat reposed position. His legs were extended, but kind of, he was sitting up. . . . Like in an L position.

. . . .

Q:  How did he swing his legs at you?  What was the motion?  Was it a kick or was it just sort of flailing?

A:  It was a kick.

. . . .

A:  When Inmate Sanders kicked me, I then reached up and grabbed him, because him being in a higher position, that kind of give him an advantage, you know, to kick me again.  I pulled him off the bunk to the floor.

. . . .

A:  . . . After I pulled him off the bunk, 'Place your hands behind your back.'  At that time he failed to comply.  He was kind of struggling and flailing about.

Q:  Do you recall if Mr. Sanders had hit his head on anything on his way from the bunk to the floor?

---

[2]  Defendant Chukudi testified that he did not enter the cell at the same time as Defendants Farlow and Vernon.  Chukudi testified that by the time he entered the cell, Sanders was already on the ground. (Def. Chukudi Dep. p. 86)

4

A:  I thought he hit his head . . . .  So when I pulled
    him, on his way down, I thought his head hit the [steel]
    table [welded into the wall] on the way down and then
    onto the floor.

(Vernon Dep. p. 80-82)

Sanders testified that "all three [Defendants] grabbed [him] and removed [him] from the bed" (Sanders Dep. p. 177), "[his] head hit the stool that's constructed coming out of the wall," on the way down to the floor, and he lost consciousness for an indeterminate period of time. (Id. at p. 17, 21)  Cooper also testified that Sanders "was in and out of consciousness" at that time. (Cooper Dep. p. 50)

Cooper testified that he witnessed Defendant Vernon "punch" Sanders while Sanders was on the ground. (Cooper Dep. p. 46) Chukudi testified that he "saw Vernon throw a fist on one of the inmates," but could not say who the inmate was. (Chukudi Dep. p. 85-86; 89)  Farlow testified that he "did not see" Vernon punch Sanders (Farlow Dep. p. 100); and Vernon testified, "I don't recall punching [Sanders]." (Vernon Dep. p. 83)

Sanders testified that Defendant Vernon "kicked" him in the face, "hit" him in the head with a radio, and "repeatedly kicked . . . and stomped" his side, legs, head, and back. (Sanders Dep. p. 19, 22-23)  Cooper similarly testified that Defendant Vernon "hit" and "stomped" Sanders "in his face" "multiple, multiple times

through the whole thing," (Cooper Dep. p. 56), and "used

[Vernon's] radio" to hit Sanders. (Id. at p. 58)

Sanders testified that Defendant Farlow was holding him down

at this time (Sanders Dep. p. 18, 173), and that Farlow "kicked"

him, and Chukudi "was stomping" him. (Id. at p. 174, 206) Sanders

further testified that "somebody" "punched [him] with . . . keys"

in the back. (Id. at p. 208)

Cooper testified that he saw "Vernon hitting on [Sanders] and

Chukudi holding [Sanders]." (Cooper Dep. p. 50, 55) Defendant

Farlow testified that Vernon and Chukudi were "struggling" "to get

[Sanders] handcuffed and under control." (Farlow Dep. p. 94)

Defendant Chukudi testified that Farlow instructed Chukudi to

"cuff [Sanders] down immediately and send him downstairs."

(Chukudi Dep. p. 89)[3]

Sanders and Cooper both testified that Sanders was compliant

through the entire altercation. (Sanders Dep. p. 212; Cooper Dep.

p. 50) Defendant Vernon testified that Sanders "wasn't complying"

with orders. (Vernon Dep. p. 82-83)

Sanders testified that he suffered the following injuries:

> My left eye was gashed open, my teeth went through my
> bottom lip, my teeth was [sic] loose, I had a hole in my
> back where somebody punched me with keys, bruises,
> contusions about my body. My face was disfigured. My
> leg, I couldn't stand up.

---

[3] Sanders testified that Farlow handcuffed him. (Sanders Dep. p.
181)

(Sanders Dep. p. 92-93; see also Id. at p. 221)

Cooper testified that immediately after the incident Sanders "complained" "my leg, my leg, my leg." (Cooper Dep. p. 62)

Vernon testified that he saw that Sanders' "eye was bleeding,"[4] so he sent Sanders "down to get taken a look at by Medical." (Vernon Dep. p. 83)

The medical records maintained by Defendant CFG Health Systems on behalf of the Camden County Correctional Facility reflect the following. Shortly after the incident, at approximately 12:45 a.m., a nurse examined Sanders. (Pl's Ex. 12 at C. Sanders CCCF 52) She observed that he had "stable gait," clear speech, a laceration to the left eye with new and old bruising, and swelling. (Id.) The nurse cleaned the wound, applied "steri-strips," and referred Sanders to see a doctor "in [the] a.m." (Id.)

Sanders did not see a doctor the next morning, but did the following day, on January 28th. (Pl's Ex. 12 at C. Sanders CCCF 50) The doctor recorded, in relevant part, "stable gait," soreness, swelling and discoloration to the left periorbital area and right scapula tenderness. (Id.) The doctor also observed that four of Sanders' teeth were loose and a referral to dental was made and an x-ray ordered. (Id. at C. Sanders CCCF 26) There is no record of

---

[4] Defendant Chukudi similarly testified that he observed "some blood gushing down on [Sanders'] jumpsuit." (Chukudi Dep. p. 91)

any complaints of injury to the lower back or lower extremities. (Pl's Response to CFG's Statement of Undisputed Material Facts, hereafter "Pl's R. CFG SUMF," ¶ 19)

Sanders' medical file further documents the following sequence of events:

- On March 7, 2013, Sanders submitted a sick call slip complaining of headaches and pain in the lower back down the right leg to the foot and it was noted by a nurse that Sanders was on Neurontin and he would follow-up with a doctor. (Pl's R. CFG SUMF ¶ 20)

- Sanders submitted a sick call slip dated March 10, 2013 complaining of chronic headaches and pain in the back and legs and a nurse, on March 12, 2013, noted that Sanders had already been seen by a provider on March 11, 2013. (Pl's R. CFG SUMF ¶ 21)

- Sanders was seen by Dr. Ronsayro on March 11, 2013 with complaints of headache, pain in right buttock shooting down right leg. Dr. Ronsayro's assessment was of sciatica in the right lower extremity and right foot drop and orders were placed for an ace bandage and Indocin for 90 days. (Pl's R. CFG SUMF ¶ 22-23)

- On March 25, 2013, Sanders submitted a sick call slip complaining of pain in the right foot and leg as well as swelling of the leg, foot and ankle; a nurse noted that Sanders had been seen by the doctor on March 11, 2013 and that medications were ordered for the Plaintiff and he was given an Ace® bandage. (Pl's R. CFG SUMF ¶ 24)

- On or about March 31, 2013, Sanders submitted a sick call slip complaining of swelling to the right leg, ankle and foot, as well as pain and, on April 1, 2013, a nurse noted swelling to the right ankle, non-pitting, no redness, no ecchymosis. The nurse also noted that Sanders denied any injury and referred Sanders to a doctor. (Pl's R. CFG SUMF ¶ 25-26)

- Sanders was seen by medical director Dr. Juan Utreras on April 2, 2013 who noted Sanders' complaint of right ankle tenderness as well as full range of motion with occasional right foot dragging. Dr. Utreras noted minimal edema, normal gait, normal sensation, that Sanders was seeking more pain medication, threatening to contact his lawyer, and pain medication, Indocin, was given based on objective findings. (Pl's R. CFG SUMF ¶ 27-28)

- On April 12, 2013, Sanders submitted a sick call slip seeking renewal of unspecified medications and, on April 15, 2015, a nurse entered an order for Neurontin for Sanders. (Pl's R. CFG SUMF ¶ 29)

- On April 27, 2013, Sanders submitted a sick call slip seeking renewal of unspecified medications and a nurse noted that Sanders' prescription for Neurontin was good through July 14 and his prescription for Indocin was good through June 9, 2013. (Pl's R. CFG SUMF ¶ 30)

- On May 10, 2013, Sanders submitted a sick call slip complaining of swelling to his right leg, foot and ankles and a nurse referred Sanders to a doctor for this ongoing issue, and noted that Sanders was to be seen on May 14, 2013. (Pl's R. CFG SUMF ¶ 31)

- On May 11, 2013, Sanders submitted a sick call slip complaining of swelling to his right leg, foot and ankle, and pain and, on May 12, 2013, Sanders was seen by a nurse who referred Sanders to the doctor to be seen on May 14, 2013. (Pl's R. CFG SUMF ¶ 32)

- Sanders was seen by medical director Dr. Juan Utreras on May 14, 2013 for complaints of bilateral lower extremity edema for 2 weeks. Dr. Utreras ordered an EKG, chest x-ray and lab work and prescribed Lasix with a follow-up in 7 days. (Pl's R. CFG SUMF ¶ 33-34)

- Sanders was seen in follow-up by medical director Dr. Utreras on May 21, 2013. Dr. Utreras noted Sanders' complaint of continuing bilateral lower extremity edema, injury history and drop foot, and lab results were noted to be within normal limits. Dr. Utreras noted reduced edema and the plan was to continue Lasix. (Pl's R. CFG SUMF ¶ 35-37)

• On June 8, 2013, Sanders was seen by a nurse who noted that Sanders complained of a knot in the groin, thigh and calf, indicating that he woke up with these complaints. The nurse noted tenderness in right thigh, negative Homan's sign and negative findings of a palpable lump or mass, skin was warm and dry with no visible lesions. The nurse noted that Sanders was on Indocin and Lasix and Sanders was referred to the doctor. (Pl's R. CFG SUMF ¶ 38-40)

• On June 9, 2013, Sanders was seen by Dr. Estrella Ronsayro who noted Sanders' complaint of diffuse swelling upon waking up that morning. Dr. Ronsayro noted diffuse swelling of the right lower extremity with erythematous purplish discoloration and an erythematous palpable cord along medial side of the right thigh, positive tenderness on palpation, positive Homan's sign, and increased temperature. Dr. Ronsayro ordered Plaintiff transferred to Our Lady of Lourdes Hospital to rule out cellulitis and to rule out deep vein thrombosis. (Pl's R. CFG SUMF ¶ 41-43)

Sanders testified that throughout this time "my leg kept swelling up. . . . It would swell, go down, swell, go down. I felt a lump in my calf, my thigh, my groin area, and it would come, it would go. Then some days I could walk on it, some days I couldn't." (Sanders Dep. p. 114)

Sanders received in-patient treatment at the hospital for 10 days. (Sanders Dep. p. 123; Pl's Ex. 14) He was diagnosed with severe cellulitis, abscess of leg, and necrotizing fasciitis, and underwent three surgeries during his hospital stay. (Pl's Ex. 14) Sanders testified:

> Q: Have any of your physicians ever told you that the surgery you received . . . back in June of 2013 was related to the incident of January 27, 2013?

10

A:   Yes.   They said the injury I sustained more
than likely came from blunt force trauma.

Q:  They said 'more than likely'?

A:  Yes.

(Sanders Dep. p. 191)

It is undisputed that Sanders never filed a grievance form
related to either the alleged beating or the alleged denial of
medical care.  Sanders testified that he feared retaliation if he
filed a grievance form:

Q:  Did you obtain a grievance form and fill it out?

A:  No.

Q:  Why not?

A:  Because I was in fear-- I was in fear of retaliation
because I know how the jail thing go.  I already know,
when you fill it out, there's going to be some retri--
there's going to be something happen behind, there's
going to be somebody retaliate.
     So, by the time that [corrections officers] passed
the forms out, [inmates] never got the chance to return
the forms in.  [Corrections officers] passed the forms
out at 6 o'clock at night.  I was assaulted [at
midnight].

(Sanders Dep. p. 201-02)

According to Sanders and Cooper, the beating on January 27th
was itself motivated by retaliatory intent.  Both men testified
that they believe corrections officers sought to punish inmates
for attempting to file grievances, or deter them from filing
grievances, about an assault of another inmate they had witnessed

11

approximately 4 to 6 hours prior. (Sanders Dep. p. 16; 76-82; 85-87; Cooper Dep. p. 36-44)   Specifically, Sanders testified,

> After the [assault] happened . . . Sergeant Monroe came back on the tier, and people said they wanted grievance forms.  And he said well, if y'all want grievance forms, what y'all trying to do, start a riot?  He said if y'all trying to incite a riot, we'll come back and tear this motherfucker up.
>     He came back with about 20 grievances for a hundred and some people. . . . We was [sic] locked [down].  There was no way that [the grievances] could get passed around or circulated for everyone to sign them.  And not just that.  When you sign them, you know, . . . it's fearful retaliation anyway.
> . . . .
>     [After that] I went to sleep and woke up to a beating.

(Sanders Dep. p. 169-70)

> Cooper similarly testified,

> [Sergeant Monroe] said, what you threatening me, and the rest of the inmates said we want grievances.  So he said what ya'll trying to do, incite a riot?  From there they said no, we want grievances.
>     From there we took it as a threat right back.  It was a threat to us, because to say that we're inciting a riot, how can we incite a riot if we all locked behind our doors. . . .
> . . .
>     [Sergeant Monroe] came back within 20 minutes with the grievances. . . .
> . . .
>     [Within a few hours] me and Craig [Sanders] woke up to a beating.

(Cooper Dep. p. 41-42, 44)

Defendant Vernon also testified that he was made aware of the incident involving Sergeant Monroe upon starting his shift on January 27th, and went to Sanders' cell on the 27th with the

intention of addressing the "threats" that had been made. (Vernon Dep. p. 56, 79)

Defendant Farlow similarly testified that Vernon "was upset about that an incident had occurred on [the] previous shift" and asked Farlow to accompany him to Sanders' cell specifically to talk to the inmates about the previous incident. (Farlow Dep. p. 76)

The Complaint asserts the following claims against "all Defendants": (1) "negligent, reckless, intentional and outrageous conduct"; (2) "civil rights" violations pursuant to 42 U.S.C. § 1983; (3) assault; (4) battery; (5) "negligent, reckless, intentional and outrageous conduct medical malpractice"; and (6) "discrimination based on race/religion based [sic] in violation of the 5th and 14th Amendments to the United States Constitution" pursuant to 42 U.S.C. § 1983. Against Defendant CFG, only the constitutional claims (Counts 2 and 6) remain at this point in the litigation. (Pl's R. CFG SUMF ¶ 10)

Before the Court are the summary judgment motions of: (a) Defendants County of Camden, Camden County Correctional Facility, Officer Chukudi, and Warden Eric M. Taylor; (b) Defendant CFG; (c) Defendant Officer Farlow; and (d) Defendant Officer Vernon.

**II.**

Summary judgment is appropriate where the Court is satisfied that "'the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any,' . . .

demonstrate the absence of a genuine issue of material fact" and

that the moving party is entitled to a judgment as a matter of

law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)(citing

Fed. R. Civ. P. 56).

An issue is "genuine" if it is supported by evidence such

that a reasonable jury could return a verdict in the nonmoving

party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). A fact is "material" if, under the governing substantive

law, a dispute about the fact might affect the outcome of the

suit. Id. "In considering a motion for summary judgment, a

district court may not make credibility determinations or engage

in any weighing of the evidence; instead, the non-moving party's

evidence 'is to be believed and all justifiable inferences are to

be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d

241, 247 (3d Cir. 2004)(citing *Anderson*, 477 U.S. at 255).

Initially, the moving party bears the burden of demonstrating

the absence of a genuine issue of material fact. *Celotex*, 477 U.S.

at 323 ("[A] party seeking summary judgment always bears the

initial responsibility of informing the district court of the

basis for its motion, and identifying those portions of 'the

pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any,' which it believes

demonstrate the absence of a genuine issue of material fact.");

14

*see also Singletary v. Pa. Dept. of Corr.*, 266 F.3d 186, 192 n.2 (3d Cir. 2001) ("Although the initial burden is on the summary judgment movant to show the absence of a genuine issue of material fact, 'the burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case' when the nonmoving party bears the ultimate burden of proof.")(citing *Celotex*, 477 U.S. at 325).

Once the moving party has met this burden, the nonmoving party must identify, by affidavits or otherwise, specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324. A "party opposing summary judgment 'may not rest upon the mere allegations or denials of the . . . pleading[s.]'" *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001). For "the non-moving party[ ] to prevail, [that party] must 'make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Cooper v. Sniezek*, 418 F. App'x 56, 58 (3d Cir. 2011)(citing *Celotex*, 477 U.S. at 322). Thus, to withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict those offered by the moving party. *Anderson*, 477 U.S. at 257.

**III.**

**A.   CFG's Motion for Summary Judgment**

CFG moves for summary judgment on the remaining two claims against it.

**1. Deliberate indifference to Sanders' serious medical needs**

Sanders' theory of his case is that "despite his repeated [sick call] visits [over several months] and obvious pain, the CFG medical professionals did not perform any diagnostic testing or recommend hospitalization.  Instead, the CFG employees continued prescribing [Sanders] the same medical [sic] and same treatment." (Opposition Brief, p. 37-38)

Critically, however, the only remaining claims are against CFG the entity, not any of its individual employees.  In order to impose liability on CFG, Sanders must establish that there was a relevant CFG policy or custom, and that the policy caused the constitutional violation Sanders alleges. *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003)(*citing Bd. of the County Comm'rs of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 404 (1997)).

Sanders argues that a reasonable factfinder could find a policy or custom based on the pattern of Sanders' treatment from January to June 2013. (Opposition Brief, p. 38)  The Court disagrees.  The pattern of treatment with regard to only Sanders is insufficient to support a factual finding "that the relevant practice is so widespread as to have the force of law." *Brown*, 520

16

U.S. at 404; *see generally Natale,* 318 F.3d at 584 ("There are three situations where acts of a government employee may be deemed to be the result of a policy or custom of the governmental entity for whom the employee works, thereby rendering the entity liable under § 1983.  The first is where the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy.  The second occurs where no rule has been announced as policy but federal law has been violated by an act of the policymaker itself.  Finally, a policy or custom may also exist where the policymaker has failed to act affirmatively at all, though the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need.")(internal citations an quotations omitted).

The record evidence is insufficient to support a finding that any alleged failing on the part of individual CFG employees was the result of a policy, practice or custom of CFG.  Accordingly, summary judgment will be granted to CFG on this claim.

## 2. Discrimination

CFG also moves for summary judgment on Sanders' claim that CFG's alleged failure to properly treat him was motivated by

discriminatory animus.  Sanders makes no argument in opposition, and points to no record facts supporting this claim.  Further, the Court's review of the record reveals no facts supporting Sanders' claim of discrimination against CFG or its individual employees.

Sanders has failed to sustain his summary judgment burden on his discrimination claim against CFG.[5]  Accordingly, CFG's Motion for Summary Judgment will be granted as to this claim.

## B.    Availability of CCCF's grievance procedure under the PLRA

All of the remaining summary judgment motions have one issue in common.  As the Court previously stated in the opinion addressing CFG's separate motion on this issue[6]:

> The question presented is whether the corrections officers' alleged actions, and Plaintiff's alleged fear of further retaliation, rendered the administrative grievance procedure at the Camden County Jail "unavailable" to Plaintiff under the PLRA. *See* 42 U.S.C. § 1997e(a)(an inmate must exhaust such "administrative remedies as are available" before filing suit to challenge prison conditions).
>
> The Supreme Court has recently identified "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief," and therefore not "'available.'" *Ross v. Blake*, 136 S.Ct. 1850, 1859, 195 L. Ed. 2d 117 (June 6, 2016).  The third circumstance is at issue here: the administrative process may be rendered unavailable under

---

[5]  Additionally the discrimination claim fails for the same reason the medical treatment claim fails.  Sanders has put forth no evidence of any policy, pattern or custom of CFG discriminating against inmates.

[6]  The Court denied the motion without prejudice with leave to renew in the event that the Court denied summary judgment on the merits of Sanders' claims against CFG.

the PLRA "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation," or when "officials misle[ad] or threaten[] individual inmates so as to prevent their use of otherwise proper procedures." *Id.* at 1860.

Thus, *Ross* supports the holding that fear of retaliation resulting from "threats or intimidation," 136 S.Ct. at 1859 n.3, can excuse a plaintiff's failure to exhaust. *Ross*'s facts did not implicate this particular exception, however, and therefore the Supreme Court had no occasion to elaborate on whether an inmate's fear of retaliation must be subjective, objective, or both. Indeed, the Court's citation to *Schultz v. Pugh*-- in which Judge Posner wrote, "the law governing unavailability of prison remedies on ground of intimidation is in some disarray. The case law distinguishes between 'objective' and 'subjective' availability [and] it is unclear whether the prisoner should be required to satisfy both in every case," 728 F.3d 619, 620 (7th Cir. 2013) -- suggests that the Supreme Court may have deliberately left this question open.

It is precisely this open question that is raised by the instant motion.

*Sanders v. Cty. of Camden*, No. 15-1129, 2017 U.S. Dist. LEXIS 31781, at *3-4 (D.N.J. Mar. 1, 2017).

The Court need not answer the open question here because the record evidence raises material issues of fact as to both objective and subjective fear of retaliation.

As to objective fear, the record evidence, viewed in the light most favorable to Sanders, supports a conclusion that a reasonable inmate would fear that merely asking for a grievance form would, within hours, result in a physical assault from corrections officers. A reasonable factfinder could infer that

19

the alleged beating at issue in this suit was itself in reaction to other inmates' requests for grievances, or based on the Defendant Corrections Officers' mistaken belief that Sanders had requested a grievance form. Additionally, a reasonable factfinder could find that Sergeant Monroe made a threat when inmates asked for grievance forms.

As to subjective fear, Sanders testified that he feared retaliation if he filed a grievance. (Sanders Dep. p. 201-02)

Accordingly, Defendants' Motions for Summary Judgment will be denied as to the PLRA exhaustion issue.[7]

## C. The Motions for Summary Judgment by Defendants Vernon, Farlow, and Chukudi

### 1. Excessive force

Sanders was a pretrial detainee during the relevant time period; therefore his excessive force claim is analyzed under Fourteenth Amendment Due Process standards. *Kingsley v. Hendrickson,* 135 S. Ct. 2466 (2015); *see also Bell v. Wolfish*, 441 U.S. 520 (1979); *see generally Graham v. Connor,* 490 U.S. 386, 395 n.10 (1989)("It is clear . . . that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment.")(citing *Wolfish*).

---

[7] In light of the disposition of this issue, the Court need not reach Sanders' alternate argument that the grievance procedure at CCCF was optional, not mandatory. Even if the grievance procedure was mandatory disputed facts remain as to whether the asserted grievance procedure was "available" under the PLRA and *Ross*.

"[A] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 135 S. Ct. at 2473.

> Considerations such as the following may bear on the reasonableness or unreasonableness of the force used: the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.*

The individual corrections officers' arguments in support of summary judgment on this issue fail to construe the record evidence in the light most favorable to Sanders. All three officers argue that there is insufficient evidence to support an excessive force claim against them. Indeed, Farlow goes so far as to assert that he "did not touch Plaintiff during the altercation" (Moving Brief, p. 14).

These arguments ignore the deposition testimony of Sanders and Cooper which, as set forth above, clearly state that all three officers actively participated in the beating. Viewing the record in the light most favorable to Sanders, a reasonable factfinder could find that it was three (Vernon, Farlow, and Chukudi) on one (Sanders).

Moreover, the record evidence is sufficient to support a finding that the amount of force used was objectively unreasonable

under the circumstances. Again, viewing the record evidence in the light most favorable to Sanders, all of the *Kingsley* factors support this conclusion.

First, a reasonable factfinder could conclude that there was no need to use force at all under the circumstances. The officers sought out Sanders in his cell, after midnight, while the jail was on lock down, and awoke Sanders from sleep or near-sleep.[8] From these facts, a reasonable factfinder could conclude that there was no security problem at the time, and no reasonable officer could perceive that there was a threat.

Second, even leaving aside the cellulitis in Sanders' right leg, which Defendants dispute was caused by the alleged beating, Sanders' other injuries were severe. In addition to the gash above his eye and other bruising, Sanders hit his head on a metal table while being dragged from the top bunk, and lost consciousness. Medical records further document that Sanders had four loose teeth after the incident.

Third, both Sanders and Cooper testified that Sanders was not resisting.

---

[8]  Indeed, even under the Defendants' version of events, they went to Sanders' cell to address some unspecified threat that had occurred several hours earlier.

22

Therefore, the record construed in the light most favorable to Sanders sufficiently supports an excessive force claim against each corrections officer.

Additionally, disputed issues of material fact preclude summary judgment on the ground of qualified immunity.[9]  Under the law at the time, the corrections officers would have known that their actions violated clearly established law. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009)("The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'")(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "It is clear ... that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. at 395 n. 10 (citing *Wolfish*).  Whether force constitutes "punishment" depends on whether it is "rationally related to a legitimate nonpunitive governmental purpose" and whether it "appear[s] excessive in relation to that purpose." *Wolfish*, 441 U.S. at 561.

The Motions for Summary Judgment will be denied as to the excessive force claim against each individual corrections officer.

---

[9]  Only Defendants Farlow and Chukudi move for summary judgment on the issue of qualified immunity.

**2. Assault and battery**

Defendants Farlow and Chukudi assert that these state law claims must be dismissed because Sanders' Notice of Tort Claim pursuant to N.J.S.A. § 59:8-4 does not specify how they participated in, or caused Sanders' injuries. Rather, the Notice, which is a fill-in-the-blank form apparently provided by Camden County, states, "[o]n Jan. 27, 2013 the claimant was punched in the face with keys held by Lt. Vernon and kicked on the right side of the body." (Farlow Ex. Q)  The Notice does, however, identify Farlow and Chukudi by name, as people Sanders "claims is at fault."  (Id.)

Sanders argues, and the Court agrees, that the Notice includes all of the statutorily required items.  The statute provides,

> A claim . . . shall include:
>
> a.  The name and post office address of the claimant;
>
> b.  The post-office address to which the person presenting the claim desires notices to be sent;
>
> c.  The date, place and other circumstances of the occurrence or transaction which gave rise to the claim asserted;
>
> d.  A general description of the injury, damage or loss incurred so far as it may be known at the time of presentation of the claim;
>
> e.  The name or names of the public entity, employee or employees causing the injury, damage or loss, if known; and

f. The amount claimed as of the date of presentation of the claim, including the estimated amount of any prospective injury, damage, or loss, insofar as it may be known at the time of the presentation of the claim, together with the basis of computation of the amount claimed.

N.J.S.A. § 59:8-4.

The statute does not require that the Notice of Tort Claim include a description of how the identified employees allegedly caused the injury. Accordingly, Defendants' Farlow and Chukudi's Motions for Summary Judgment on this issue will be denied.

Defendants Farlow and Chukudi further assert that the record evidence does not support Sanders' assault and battery claims on the merits. The Court rejects this argument for the reasons articulated with respect to the excessive force claim. The record evidence, viewed in the light most favorable to Sanders, supports a claim for assault and battery against each officer. Specifically, Sanders testified that Farlow "kicked" him, and Chukudi "was stomping" him. (Sanders Dep., p. 174, 206).

Lastly, Defendant Vernon asserts that he is entitled to good faith immunity under N.J.S.A. § 59:3-3, which provides "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law." This argument fails. As discussed with respect to the excessive force claim, a reasonable factfinder

could conclude that Defendant Vernon acted not in good faith, but rather with the intent to punish.

The Motions for Summary Judgment will be denied as to the assault and battery claims against each individual corrections officer.

### 3. **Failure to intervene**

Defendants Farlow and Chukudi assert that they are entitled to summary judgment on Sanders' claim that they failed to intervene to stop the use of excessive force by Defendant Vernon.

"[A] corrections officer who fails to intervene when other officers are beating an inmate may be liable on a failure-to-protect claim if the officer had a realistic and reasonable opportunity to intervene and simply refused to do so." *Bistrian v. Levi*, 696 F.3d 352, 371 (3d Cir. 2012).

Farlow and Chukudi assert that they had no realistic and reasonable opportunity to intervene, but that argument is based on their version of events. As Sanders correctly observes, "there is no dispute that Sgt. Farlow and Officer Chukudi were both in and around Plaintiff's cell at the very moment Vernon was applying force against Plaintiff." (Opposition Brief, p. 27) The record evidence, taken as a whole and viewed in the light most favorable to Sanders, raises sufficient issues of fact to support submitting this question to the jury.

Additionally, issues of material fact preclude summary judgment on the issue of qualified immunity. The duty to intervene was clearly established at the relevant time. *See Bistrian*, 696 F.3d at 371; *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002)(holding that "a corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so"); *Natale*, 318 F.3d at 581 ("the Supreme Court has concluded that the Fourteenth Amendment affords pretrial detainees protections at least as great as the Eighth Amendment protections available to a convicted prisoner.").

The Motions for Summary Judgment on Sanders' failure to intervene claim will be denied.

### 4. Intentional infliction of emotional distress

Defendants Farlow and Chukudi move for summary judgment on the intentional infliction of emotional distress claim which is arguably asserted in the complaint. However, Sanders' opposition brief states that "Plaintiff has not alleged a cause of action for intentional infliction of emotional distress." (Opposition Brief, p. 31 n. 4)

Accordingly, the motions for summary judgment as to this claim will be denied as moot.

### 5. Punitive damages

All three corrections officers move for summary judgment on Sanders' claim for punitive damages. As the Court's discussion above concerning excessive force, assault, and battery, make clear, issues of disputed fact preclude summary judgment on Sanders' claim for punitive damages. *See Springer v. Henry,* 435 F.3d 268, 281 (3d Cir. 2006) ("A jury may award punitive damages when it finds reckless, callous, intentional or malicious conduct."); *Smith v. Whitaker*, 160 N.J. 221, 242 (1999)(to obtain punitive damages a "plaintiff must prove by clear and convincing evidence a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to the consequences.").

The Motions for Summary Judgment will be denied as to this issue.

**6. Failure to provide constitutionally adequate medical treatment**

To the extent that Sanders asserts a failure to provide medical care claim against the corrections officers, the corrections officers' motions for summary judgment on this claim will be granted.

Sanders makes no argument in opposition, and points to no record facts supporting this claim. Moreover, nothing in the record supports a finding that any corrections officer prevented Sanders from getting medical treatment. To the contrary, the

28

undisputed evidence demonstrates that Sanders was immediately escorted to receive medical treatment after the alleged beating occurred.

### 7. Discrimination

All three corrections officers move for summary judgment asserting that Sanders has failed to put forth sufficient evidence in support of his claim for racial / religious discrimination. Sanders makes no argument in opposition, and points to no record facts supporting this claim. Further, the Court's review of the record reveals insufficient facts supporting Sanders' claim of discrimination against the corrections officers.[10]

Sanders has failed to sustain his summary judgment burden on his discrimination claim. Accordingly, the corrections officers' Motions for Summary Judgment will be granted.

### 8. Causal link between the beating and Sanders' cellulitis and post-traumatic stress

Lastly, Defendant Vernon argues that he is entitled to summary judgment on Sanders' claims for damages related to the cellulitis in his leg and post-traumatic stress. Vernon argues

---

[10]  The only evidence the Court has found is Sanders' deposition testimony that he believes Vernon attacked him "[because it was the thing with the Muslims.  The Muslims have a problem with the officers.  I got caught up in it because my bunky was Muslim. [Vernon] said you motherfuckers aren't going to run this jail. And the only people that's Muslim over there is black." (Sanders Dep. p. 224)

that the lack of any expert testimony establishing causation is fatal to Sanders' claims.

In opposition, Sanders argues that the evidence from his treating physicians is sufficient to support submitting the question to the jury. The Court agrees.

*Stigliano by Stigliano v. Connaught Labs., Inc.*, which Vernon relies upon in moving for summary judgment, explains, "as fact witnesses, the treating doctors may testify about their diagnosis and treatment of [their patient's] disorder, including their determination of that disorder's cause." 140 N.J. 305, 314 (1995).

In this regard, Sanders points to the following record evidence: (1) his treating physician at the hospital told him that his cellulitis was more than likely caused by blunt force trauma (Sanders Dep. p. 191) and, (2) his medical records from South Woods State Prison which document that he has post-traumatic stress related to "being assaulted by CO's at the county jail in 2013." (Pl's Ex. 15).[11]

This record evidence is sufficient to support submitting the question of causation to the jury. Defendant Vernon's Motion for Summary Judgment on this issue will be denied.

---

[11] The Court makes no ruling on the admissibility of any evidence at this time. Defendants may raise such issues in an appropriate motion in limine, if necessary.

**D. The Motion for Summary Judgment by Defendants County of Camden, Camden County Correctional Facility, and Warden Eric M. Taylor**

**1. CCCF is not an entity amenable to suit under § 1983**

Camden County / CCCF moves for summary judgment on all § 1983 claims against CCCF asserting that "CCCF is not an entity separate and apart from Camden County. CCCF is not a governing body, and does not have any autonomous existence; it is merely a building where the Plaintiff was incarcerated." (Moving Brief, p. 5) Sanders makes no argument in opposition.

Other judges within this District have held that New Jersey correctional facilities, and CCCF specifically, are not amenable to suit under § 1983. *Turner v. Camden Cty. Corr. Facility*, 2017 WL 88976, at *1 (D.N.J. Jan. 10, 2017); *Grabow v. Southern State Corr. Facility*, 726 F. Supp. 537, 538-39 (D.N.J. 1989).

The Motion for Summary Judgment will be granted on this issue.

**2. Constitutionally adequate medical treatment claim against Camden County**

Sanders' medical treatment claim against Camden County is co-extensive with his medical treatment claim against CFG. For the same reasons CFG is entitled to summary judgment, Camden County is entitled to summary judgment. Camden County's Motion for Summary Judgment as to this claim will be granted.

**3. Failure to adequately train the corrections officers in the use of force**

Sanders relies on the deposition testimony of Defendants Vernon and Farlow to support his assertion that training in the use of force was inadequate. Vernon testified that corrections officers only receive actual physical training and practice "at the academy" but not on the job. He explained,

> When you're using force, it's very stressful for everybody. And from having it one time in the academy and not having it again, for instance practicing handcuffing or defensive tactic presents a problem. If you don't practice your techniques, you'll lose the ability to . . . apply those techniques.

(Vernon Dep. p. 24)

Farlow also testified that "[h]ands on training was done one time through the academy. . . . It would have been helpful to be given retraining and refresher training on . . . hand-to-hand take downs, tactical handcuffing and those things we never received." (Farlow Dep. p. 14)

Sanders asserts a "single-incident" theory of failure to train. (Opposition Brief, p. 32-35); *see generally City of Canton, Ohio v. Harris,* 489 U.S. 378 (1989). Relying on *Thomas v. Cumberland Cty.*, 749 F.3d 217 (3d Cir. 2014) and *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center,* 372 F.3d 572 (3d Cir. 2004), Sanders argues that Camden County's failure to adequately train its corrections' officers in the use of force: (1) amounts to deliberate indifference to the rights of the

32

inmates with whom those officers will come into contact, and (2) this failure caused Sanders' constitutional injury.

The Court holds that issues of material fact preclude summary judgment on this claim. "Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Thomas*, 749 F.3d at 223 (internal citations and quotations omitted). "[I]n certain situations, the need for training 'can be said to be so obvious, that failure to do so could properly be characterized as deliberate indifference to constitutional rights.'" *Id.* (quoting *City of Canton*, 489 U.S. at 390 n.10).

The Court concludes that the need to train corrections officers at CCCF on the use of force may be found to be obvious, similar to the hypothetical obvious need to train police officers in the use of deadly force discussed in *City of Canton*, 489 U.S. at 390 n.10, and the obvious need to train juvenile facility child care workers on conflict de-escalation techniques in *A.M.* 372 F.3d at 575, 580.

A jury could find that there is a high "likelihood that the situation will recur" and the "predictability" is also high "that an officer lacking specific tools to handle that situation will violate citizens' rights." *Thomas,* 749 F.3d at 223–24. Sanders' expert witness states in his report that "it is recognized that

correction officers may have to employ force,"[12] and the expert's
reliance on model use of force policies prepared by the Legal and
Liability Risk Management Institute supports an inference that
lack of training will violate inmates' rights. (Camden County Ex.
D)

Additionally, Sanders' expert's opinion that the failure to
train caused the violation of Sanders' Fourteenth Amendment rights
creates an issue of material fact as to causation.  The expert
report states, "[t]he incident and the use of force could have
been avoided . . . if Vernon, Farlow and Chukudi were better
trained." (Camden County Ex. D) *See Thomas,* 749 F.3d at 226 ("the
causation inquiry focuses on whether the injury could have been
avoided had the employee been trained under a program that was not
deficient in the identified respect.").

The Motion for Summary Judgment will be denied as to Sanders'
failure to train claim.

**4. Discrimination**

At the risk of unnecessary repetition, it appears that Sanders
has abandoned any discrimination claim, as he makes no argument in

---

[12] Camden County argues that "Sanders has produced no evidence of
frequent excessive force cases at the CCCF." (Reply Brief, p. 10)
Camden County misstates the relevant inquiry, which focuses on the
frequency with which the need to use any force arises. *See Thomas,*
749 F.3d at 225.

opposition to Camden County's Motion for Summary Judgment on this issue.

Camden County's Motion for Summary Judgment will be granted as to this claim.

### 5. The § 1983 claims against Defendant Warden Taylor

Warden Taylor moves for summary judgment asserting that there is no evidence that he had any direct personal involvement in any of the events at issue.  Therefore, Sanders is left with a theory of supervisory liability.  In that regard, the Warden Taylor asserts that "there [is no] evidence that [he] was involved by way of personal direction or knowledge and acquiescence." (Moving Brief, p. 9)  Sanders makes no argument in opposition.

Sanders has failed to articulate any specific theory of supervisory liability against Warden Taylor (as distinguished from Sanders' failure to train theory against Camden County), and has pointed to no record evidence to support any theory.  Thus, Sanders has failed to sustain his summary judgment burden and Warden Taylor's Motion for Summary Judgment on this issue will be granted.

### IV.

For the reasons stated herein, Defendant CFG's Motion for Summary Judgment will be granted.  The corrections officers' Motions for Summary Judgment will be granted in part, denied in part, and denied as moot in part as follows: the motions are

granted as to Sanders' claims for discrimination and failure to provide constitutionally adequate medical treatment, denied as moot as to the emotional distress claim, and denied in all other respects.  The remaining Defendants' Motion for Summary Judgment will be granted in part and denied in part as follows: the motion is granted as to Sanders' claims for discrimination, failure to provide constitutionally adequate medical treatment, supervisory liability of Defendant Taylor, his § 1983 claims against CCCF, and denied in all other respects.  An appropriate Order accompanies this Opinion.


Dated: August 4, 2017
At Camden, New Jersey                    ___s/ Noel L. Hillman___
                                         **Noel L. Hillman, U.S.D.J.**